# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LISA STEWART,

        Plaintiff,

        v.

ROBERT M. GATES, *et al.*,

        Defendants.

Civil Action No. 09-1738 (BAH)

## MEMORANDUM OPINION

This case involves troubling claims of employment discrimination and retaliation raised against the Defense Intelligence Agency ("DIA") by Plaintiff Lisa Chambers Stewart, a former civilian intelligence officer who worked in the DIA's Field Operating Base in Japan. The plaintiff brings this action against the Secretary of Defense, in his official capacity, and against two of her former superiors at the DIA in their individual capacities. The defendants have moved to dismiss in part, or, in the alternative, for partial summary judgment. The plaintiff opposes the defendants' motion and has also moved for discovery and for leave to amend her complaint. For the reasons explained below, the Court grants in part and denies in part the defendants' motion to dismiss in part or for partial summary judgment; grants in part and denies in part the plaintiff's motion for leave to amend her complaint; and grants the plaintiff's motion for discovery.

## I.      BACKGROUND

The plaintiff brought this case on September 14, 2009. Complaint, ECF No. 1. She is a Japanese linguist who worked as a Japanese liaison and intelligence officer with the DIA at its Field Operating Based in Japan ("FOB-J"). Compl. ¶¶ 12-13. The plaintiff alleges that she "was effective in her position . . . and she received favorable reviews and performances bonuses" prior

to July 2007, when the leadership of FOB-J changed.  *Id.* ¶¶ 16-18.  In July 2007, the individual

defendants, Col. Patrick Keough and William Desautels, became the commander and deputy

commander of FOB-J, respectively.  *Id.* ¶ 18.  According to the plaintiff, Col. Keough, who is of

Asian-American descent, and Mr. Desautels, who is of Japanese-American descent, "openly held

racial/national origin/gender biased views . . . that individuals who were not male and of

Japanese descent were less effective in performing jobs that required interaction with the

Japanese."  *Id.* ¶¶ 7-8, 18.

For example, the plaintiff alleges that in May 2007, Desautels told her that only fifty-five

year-old Japanese-American men would be capable of performing her job.  *Id.* ¶ 22.  The

plaintiff claims that she confronted Desautels about the inappropriateness of this comment.  *Id.*

In the fall of 2007, the plaintiff alleges that a slide presentation was given in the FOB-J office

discussing a "Dream Team" of ideal officers for the FOB-J.  *Id.* ¶ 23.  She claims that, in the

presentation, it was stated that the "Dream Team" would be made up exclusively of male

"Nisei," a term indicating Japanese-American descent.  *Id.*  The plaintiff alleges that she

complained that this presentation was racially and sexually offensive.  *Id.* ¶ 24.

The plaintiff claims that the defendants subjected her to various discriminatory and

retaliatory acts intended to force her out of her job at FOB-J.  For example, the plaintiff alleges

that on September 8, 2007, she was subjected to a baseless security investigation for attending a

U.S. Army picnic with her fiancé (now her husband), Col. Andrew Stewart, an army officer

stationed in Japan.  *Id.* ¶¶ 29, 50.

The plaintiff also alleges that Desautels nominated her for deployment to Iraq as an

interrogator out of discriminatory and retaliatory animosity.  *Id.* ¶ 26.  According to the plaintiff,

she had no training or experience as an interrogator nor any knowledge of Arabic, and her

proposed transfer to Iraq was contrary to a then-existing policy or practice of not sending Japanese linguists to Iraq due to their specialized skills. *Id.* ¶ 27. The plaintiff also claims that Desautels lied to her by concealing the fact that he was responsible for placing her on the Iraq deployment list. *Id.* ¶ 28. At a bilateral U.S.-Japanese function on November 1, 2007, the plaintiff claims that Keough falsely announced to her Japanese counterparts that she had accepted a new position and would be leaving Japan for Iraq; the plaintiff claims this announcement damaged her relations with her Japanese counterparts and her ability to continue working in Japan. *Id.* ¶ 32. The plaintiff claims she had not agreed to deploy to Iraq, was not aware at that time that she was slated for a deployment, and that she was considering remaining in Japan to seek employment in the private sector.[1] *Id.* ¶ 30.

Around November 19, 2007, following her refusal to accept her planned reassignment to Iraq, the plaintiff asserts that Keough told her she must resign or be immediately terminated. Declaration of Lisa C. Stewart dated March 11, 2010 (hereinafter, "Stewart Decl.") ¶ 17. According to the plaintiff, Keough "dictated some exact language to be used in my resignation letter," and she felt she had no choice but to resign. *Id.* The plaintiff announced at that time that she would resign effective February 2, 2008. *See id.* ¶¶ 12, 19.

In early December 2007, the plaintiff was the target of another security investigation that she contends resulted from a false story that Keough fabricated about her prior to her resignation. According to the plaintiff, on November 3, 2007, Keough falsely claimed that the plaintiff had attempted suicide by taking approximately 20 Ambien sleeping pills and recounted this to

---

[1] While the details of the timing and announcement of Stewart's assignment to Iraq are vague in the original complaint, the proposed amended complaint provides further clarification. According to the plaintiff, she learned in July 2007 that Desautels nominated her at that time for a deployment to Iraq as a debriefer in September 2007, but that deployment was withdrawn or never ordered. Then, in fall 2007, the plaintiff was again scheduled for a different deployment to Iraq as an interrogator in summer 2008, following six months of training that was to begin in January 2008. She learned of this new deployment via Keough's announcement at the bilateral dinner on November 1, 2007. *See* Proposed First Amended Corrected Complaint, ECF No. 16-2 ("Am. Compl.") ¶ 26; Pl.'s Opp'n to Defs.' Mot. to Dismiss in Part or Summ. J. in Part ("Pl.'s Mem.") at 2.

several of his subordinates. Compl. ¶ 33. These subordinates forced the plaintiff to go to the hospital against her will, and Keough and the subordinates submitted a DIA internal report suggesting she had attempted suicide. *Id.* On December 5, 2007, the plaintiff was instructed to board a plane, but she was not told the destination or purpose of her travel. *Id.* ¶ 34. She arrived in Washington, D.C., where she learned she was under investigation. *Id.* After arriving in Washington, a DIA psychologist interviewed the plaintiff and determined that she was not a suicide risk. *Id.* ¶ 35. A DIA Special Agent from the Security Investigations Office then interrogated the plaintiff, allegedly at the urging of Keough. *Id.* ¶ 37. At the outset of the interrogation, the plaintiff claims she informed the DIA agent that she had just learned that she was pregnant, but the interrogator persisted in using stressful techniques in questioning the plaintiff, including threatening to call members of her family to tell them lies or embarrassing information, including the allegation that the plaintiff had attempted suicide or was a suicide risk. *Id.* ¶¶ 37-39. The plaintiff also told the interrogator that she believed she was being harassed and retaliated against by her command and by him, and asked to go to the DIA Equal Employment Opportunity ("EEO") office to make a complaint. *Id.* ¶ 38.

On the day after the interrogation, December 6, 2007, the plaintiff suffered a miscarriage of her pregnancy, which she attributes to the stress from the interrogation. *Id.* ¶ 40. That same day, the plaintiff also complained to the DIA EEO office. *Id.* ¶ 41.

On December 9, 2007, the plaintiff flew back to Japan. *Id.* ¶¶ 42-43. On December 12, 2007, the plaintiff was summoned to a meeting with her command where she learned that a DIA operative had been spying on her during her return flight. *Id.* ¶¶ 42-43. This operative reported that he had seen alcohol bottles on her airline tray and had overheard a conversation between the plaintiff and the passenger seated next to her that he found inappropriate. *Id.* ¶ 43. According to

the plaintiff, the secret monitoring and December 12 meeting were part of a further attempt to harass and retaliate against her. *Id.* ¶¶ 42-44.

Two days later, on December 14, 2007, the plaintiff was informed that her security clearance had been suspended, and she was ordered to return to Washington, D.C. for further security investigations. *Id.* ¶ 45. She was placed under house arrest and ordered to prepare a power of attorney since she would not be returning to Japan. *Id.*

Based upon her doctor's orders, the plaintiff refused to travel back to Washington at that time. *Id.* ¶ 46. She further reported the alleged discrimination, harassment, and retaliation to the DIA EEO office and to the Department of Defense Inspector General's Office in Japan. *Id.* ¶¶ 47-48. Despite presenting a doctor's note explaining her refusal to travel back to Washington, the plaintiff was accused of being absent without leave. *Id.* ¶ 49. She also was not permitted to take other leave time that she claims she had earned and was entitled to use. *Id.* The plaintiff apparently quit effectively immediately around December 21, 2007. *See* Mem. in Supp. of Defs.' Mot. to Dismiss in Part or for Summ. J. in Part ("Defs.' Mem.") at 12; Stewart Decl. ¶ 19.

In March 2008, the plaintiff married Col. Andrew Stewart and the couple planned to stay in Japan, where Col. Stewart remained stationed. Compl. ¶ 50. The plaintiff alleges that Keough and others then began targeting her husband in an effort to further retaliate against her for her EEO complaints. *Id.* The plaintiff alleges that these people spoke to Col. Stewart's superior and objected to Col. Stewart's remaining in his post, which resulted in a threatened investigation against him and his ultimate transfer from Japan to Rock Island, Illinois. *Id.* ¶¶ 50-51.

The plaintiff alleges that the defendants' conduct gives rise to several causes of action. She brings a claim for discriminatory conduct and retaliation in violation of Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, against the Secretary of Defense in his official capacity. *Id.* ¶¶ 67-71. In addition, she brings causes of action under 42 U.S.C. §§ 1981, 1983, and 1985 against Defendants Desautels and Keough as individuals. *Id.* ¶¶ 72-90. She seeks various forms of relief including, back-pay, front-pay, damages for lost compensation and benefits, damages for emotional distress, reinstatement as a Japanese liaison and intelligence officer, punitive damages, and other declaratory and injunctive relief. *Id.* at 17-18.

The defendants have moved to dismiss in part, or, in the alternative, for partial summary judgment. The defendants argue that the individual defendants must be dismissed for various reasons, including that a Title VII suit against the government agency that employed the plaintiff provides the exclusive remedy for her claims of employment discrimination and retaliation. As for the plaintiff's claims against the Agency, the defendants seek to dismiss "any claim by Plaintiff under Title VII that the decision to deploy her to Iraq was discriminatory, that her resignation on November 19, 2007 is actionable under a constructive discharge theory, as well as any claim based on other alleged conduct that preceded the November 19, 2007 resignation." Defs.' Mem. at 7-8.

The plaintiff opposes the defendants' motion and has also moved for leave to amend her complaint. The purpose of the proposed amendment is "to clarify the nature of her claims related to constructive discharge and the timeline of events surrounding her deployment to Iraq." Pl.'s Mem. at 39. The plaintiff also seeks to drop her Section 1981 claim against the individual defendants and to add a claim against them under the *Bivens* doctrine. *Id.* Finally, the plaintiff requests an opportunity for discovery before being required to oppose the defendants' motion for partial summary judgment.

## II.  DISCUSSION

### A.  Defendants' Motion to Dismiss in Part or for Partial Summary Judgment

#### 1.  Standards of Review and Title VII Legal Standard

##### a.  Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557). Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the plaintiff [must plead] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

##### b.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based upon the pleadings, depositions, and affidavits and other factual materials in the record.  Fed. R. Civ. P. 56(a), (c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  The Court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  The Court must view all inferences in a light most favorable to the non-moving party.  *Tao*, 27 F.3d at 638 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 255 (1986)).  The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[S]ummary judgment is ordinarily appropriate only after the plaintiff has been given an adequate opportunity to conduct discovery." *McWay v. LaHood*, 269 F.R.D. 35, 39 (D.D.C. 2010) (citing *Americable Int'l, Inc. v. Dep't of Navy,* 129 F.3d 1271, 1274 (D.C. Cir. 1997)).

### c. Title VII

"Title VII of the Civil Rights Act makes it unlawful for an employer to 'fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting 42 U.S.C. § 2000e-2(a)(1)). The statute "establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin." *Id.* Title VII also prohibits retaliation against an employee who asserts his or her rights. Retaliation requires a showing that "the plaintiff engaged in a statutorily protected activity, the employer treated the plaintiff adversely, and a causal connection existed between the two." *Winston v. Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010) (citing *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)). "In certain cases, the doctrine of constructive discharge enables an employee to . . . demonstrate she suffered an adverse employment action by showing [a] resignation or retirement was, in fact, not voluntary." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (in ADEA context).

### 2. Plaintiff's Claims Against the Individual Defendants

The Court will first consider whether the plaintiff's Section 1983 and Section 1985 claims against the individual defendants should be dismissed.[2]

The defendants move to dismiss the Section 1983 and Section 1985 claims against the individual defendants under Rule 12(b)(6) because Title VII provides the exclusive remedy for claims of discrimination in federal employment.[3] *See Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976) (Section "717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in federal employment."); *Williams v. Bentsen*, No. 93-5192, 1993 WL 469110, at *1 (D.C. Cir. Nov. 5, 1993) (per curiam) ("[I]t is well established that Title VII provides the exclusive judicial remedy for claims of discrimination in federal employment."); *Prince v. Rice*, 453 F. Supp. 2d 14, 25 (D.D.C. 2006) (dismissing Section 1981 claim because "the Supreme Court has squarely held that Title VII 'provides the exclusive judicial remedy for claims of discrimination in federal employment.'") (quoting *Brown,* 425 U.S at 835)).

The plaintiff responds that she brought the Section 1983 and Section 1985 claims because "[d]uring the administrative proceeding, the Agency took the position that Ms. Stewart could not raise a claim under Title VII for the [alleged retaliatory] conduct concerning [her husband] because his employers were not her employers." Pl.'s Mem. at 43. In addition, the plaintiff

---

[2] As noted above, the plaintiff has conceded her original Section 1981 claim and instead seeks to add a *Bivens* claim, which will be discussed below in the section addressing the plaintiff's motion to amend her complaint.

[3] The Court notes, without deciding, that the defendants argue that Desautels and Keough should be dismissed pursuant to Rules 12(b)(2) and 12(b)(5) for insufficient service of process and lack of subject matter jurisdiction because these defendants have not been served within 120 days of filing of the complaint. *See* Defs.' Mem. at 24-25; Fed. R. Civ. P. 4(m). If the plaintiff shows good cause for the failure to complete service within 120 days, the court "must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). In this case, the plaintiff argues that she has been unable to serve Keough because he lives on a secure military base in a foreign country that is inaccessible to process servers. As for Desautels, the plaintiff apparently served a relative of his with a similar name on December 9, 2009. *See* ECF No. 16-3. The plaintiff contends she did not learn that it was not Desautels himself who had been served until the defendants pointed this out in their present submissions. *See* Pl.'s Reply in Supp. of Mot. to Amend at 2. Even if the Court were find that the plaintiff has shown good cause for why service has not been completed on the individual defendants, extending the time to serve them under Rule 4(m) would be futile for the reasons discussed *infra*, and therefore the Court declines to resolve this issue.

contends that the Agency took the position that "conduct after employment was not within Title VII." *Id.* Thus, the plaintiff argues that "[t]o the extent that [she] does not have a remedy for the [conduct targeting her husband or post-employment retaliatory conduct] under Title VII, she should be able to seek redress under other applicable statutes or in a *Bivens* action." *Id.*

Regardless of the position the Agency took during the administrative proceeding, the defendant now appears to concede that Title VII would apply to alleged retaliatory conduct directed at the plaintiff's husband and to post-employment conduct. Def.'s Combined Reply in Supp. of Mot. to Dismiss in Part or for Summ. J. in Part and in Opp'n to Pl.'s Mot. to Amend ("Defs.' Reply") at 21. Indeed, the Supreme Court has specifically held that the "scope of the [Title VII] anti[-]retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). The Court recognized that "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Id.* at 63. In addition, the Supreme Court has held that the anti-retaliation provisions of Title VII apply to post-employment retaliation. *Robinson v. Shell Oil Co*., 519 U.S. 337, 345-46 (1997).

Title VII thus covers the conduct the plaintiff has alleged and provides the exclusive remedy for her claims of discrimination in federal employment. Under Title VII, the only proper defendant is the head of the federal agency that employed the plaintiff. *See* 42 U.S.C. § 2000e-16(c); *Gary v. Long*, 59 F.3d 1391, 1399 (D.C. Cir. 1995) *cert. denied*, 516 U.S. 1011 (1995) (holding that an individual defendant cannot be held personally liable under Title VII and a claim against an individual defendant "essentially merges" with the claim against the agency); *Smith v. Janey*, 664 F. Supp. 2d 1, 8 (D.D.C. 2009) ("[T]here is no individual liability under Title VII, the ADEA or the ADA."). Accordingly, the Court will dismiss the individual defendants from this

action because all of their alleged retaliatory conduct is covered by the plaintiff's Title VII claim against the DIA. The Court need not address the parties' remaining contentions regarding the Section 1983 and 1985 claims.

### 3. Plaintiff's Title VII Claim Against the DIA

The defendants contend that they are entitled to dismissal in part or summary judgment in part with respect to the plaintiff's Title VII claim against the DIA. Defendants argue (1) that any claim of retaliation or constructive discharge based on the decision to deploy the plaintiff to Iraq is untimely because the plaintiff first learned of her placement on the Iraq deployment list in July 2007 and did not file an EEO complaint until December 2007; (2) that any claims based on conduct prior to November 2007 are time-barred or otherwise not actionable; and (3) that any constructive discharge claim based on the plaintiff's November 19, 2007 resignation is not actionable. The defendants do not, at this time, seek any decision on the plaintiff's claim as it relates to conduct that occurred after November 19, 2007, including any constructive discharge claim connected to the plaintiff's decision to quit effective immediately in December 2007. Defs.' Mem. at 13 n.5. The Court will address the defendants' contentions in turn below.

#### a. Timing Issues Related to the Decision to Deploy The Plaintiff to Iraq

Exhaustion of administrative remedies, including timely filing of an administrative complaint, is a prerequisite to maintaining a Title VII action in federal court. *Baird v. Snowbarger*, 744 F. Supp. 2d 279, 286 (D.D.C. 2010). A federal employee complaining of discrimination "must initiate contact with [an EEO counselor] within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1); *Baird*, 744 F. Supp. 2d at 286. The

defendant bears the burden of proving that the plaintiff failed to exhaust her administrative remedies. *Hines v. Bair*, 594 F. Supp. 2d 17, 22 (D.D.C. 2009).

The defendants contend here that any allegation that the decision to deploy the plaintiff to Iraq was discriminatory or resulted in her resignation is time-barred because the plaintiff learned that she would be deployed to Iraq in July 2007 and did not meet with an EEO counselor until December 6, 2007 – a period much longer than 45 days. *See* Defs.' Mem. at 16. The plaintiff responds that the initial July 2007 deployment notification related to a September 2007 deployment that was withdrawn or never ordered, and that on November 1, 2007, the plaintiff learned of a new assignment to deploy to Iraq in the summer 2008 following six months of training starting in January 2008. Pl.'s Mem. at 21. Thus, the plaintiff argues that she did contact the EEO counselor within 45 days of learning about this deployment on November 1, 2007. More fundamentally, however, the plaintiff argues that, under 29 C.F.R. § 1614.105(a)(1), the 45-day time limit for contacting the EEO counselor does not start to run "in the case of personnel action" until "the effective date of the action." Pl.'s Mem. at 20-21; 29 C.F.R. § 1614.105(a)(1).

A "personnel action" within the meaning of Title VII includes an involuntary transfer with materially adverse tangible effects. *See Sanders v. Veneman*, 131 F. Supp. 2d 225, 229 (D.D.C. 2001). The plaintiff here has alleged a number of materially adverse tangible effects would have resulted from her transfer to an interrogator position in Iraq, including loss of managerial status, benefits, and future employment opportunities. Pl.'s Mem. at 35. *See also Sanders*, 131 F. Supp. 2d at 229. Courts in this district, citing the "the plain language of the regulation" have held that the 45-day limitations period under 29 C.F.R. § 1614.105(a)(1) "begins to run from the effective date of the personnel action, not from notice of that action."

*Scarborough v. Natsios*, 190 F. Supp. 2d 5, 15-16 (D.D.C. 2002) (quotation omitted); *see also James v. England*, 332 F. Supp. 2d 239, 246 (D.D.C. 2004). Here, the plaintiff alleges the effective date for her transfer was in January 2008, when the plaintiff was scheduled to leave Japan to train for her Iraq deployment. Pl.'s Mem. at 21. The defendants have not disputed that the effective date of the transfer was in January 2008. While the parties dispute whether the operative date of the deployment notification was in July or November, that date is ultimately irrelevant to the 45-day limitations period, since the period runs from the effective date of the personnel action, not the notification date. *See also Silver v. Leavitt*, No. 05-0968, 2006 WL 626928, at *7 (D.D.C. Mar. 13, 2006) ("Although the parties have spilled much ink arguing over when exactly plaintiff learned that she had not been selected for the position, that is not necessarily the proper point of focus. The EEOC regulations state that the relevant date is the date on which the personnel action . . . became effective, not the date on which plaintiff *learned* of the personnel action."). Therefore, the statute of limitations under 29 C.F.R. § 1614.105(a)(1) did not begin to run on the date when the plaintiff learned of her Iraq assignment.[4]

According to the plaintiff's allegations, of course, her deployment to Iraq never became effective. Rather, she contends she was constructively discharged on November 19, 2007. *See* Pl.'s Mem. at 8. This constructive discharge itself would have triggered the statute of limitations

---

[4] The Court adds that *Delaware State College v. Ricks*, 449 U.S. 250 (1980), which the defendants rely on, is inapposite here. In *Ricks*, the plaintiff was a college professor who had been denied tenure by a vote of the college's board of trustees. *Id.* at 252. In June 1974, the college formally affirmed its denial of tenure to the professor but offered the professor a one-year "terminal" contract that would expire in June 1975, thus enabling him to teach at the college for one additional year. *Id.* at 253. The professor accepted this one-year contract. *Id.* In April 1975, about a year after his denial of tenure, the professor filed an administrative complaint alleging his termination was discriminatory. *Id.* at 254. When he subsequently sued on this claim, the claim was dismissed as untimely. *Id.* at 254-55. The case reached the Supreme Court, which held that the denial of tenure triggered the statute of limitations for the professor's claim, not the expiration of the one-year contract. *Id.* at 259. The defendants here contend that the date of the plaintiff's notification of deployment to Iraq is equivalent to the denial of tenure in *Ricks*, but the Court disagrees because the denial of tenure was itself a personnel action that resulted in the restructuring of the employee's contractual relationship with his employer. Moreover, *Ricks* did not involve the limitations framework in 29 C.F.R. § 1614.105(a)(1), which applies here. *See James v. England*, 332 F. Supp. 2d 239, 245 (D.D.C. 2004) (distinguishing *Ricks* on that basis).

and is only actionable if the plaintiff initiated contact with an EEO counselor within 45 days.
*See Diefenderfer v. Peters*, No. C08-958Z, 2009 WL 1884419, at *5 n.12 (W.D. Wash. Jun. 29,
2009) (plaintiff's constructive discharge claim may be dismissed where there "is no dispute that
Plaintiff failed to initiate contact regarding her alleged constructive discharge with an EEO
Counselor within 45 days of . . . resignation.").   Here, there is no dispute that the plaintiff did
initiate contact with an EEOC counselor within 45 days of November 19, 2007.  Accordingly,
any claim arising out of this alleged constructive discharge is timely.

### b.   Timing Issues Relating to Conduct Prior to November 2007

The defendants also argue that the plaintiff cannot establish Title VII liability for various
incidents alleged in the complaint that occurred more than 45 days before December 6, 2007, the
date that the plaintiff first met with an EEO counselor.  Defs.' Mem. at 20.  This conduct
includes the plaintiff's allegations that Desautels told her in May 2007 that only Japanese-
American men could do her job; that a discriminatory "Dream Team" slideshow profiling ideal
officers for FOB-J was presented in fall 2007; and that she was subject to a baseless security
investigation in September 2007 for attending a picnic with her fiancé.  *See id*.

The plaintiff appears to concede that these events are not independently actionable due to
the time limit, but argues that they may properly be invoked as evidence supporting a finding
that discrimination or constructive discharge occurred within the 45-day period.  Pl.'s Mem. at
27.  The plaintiff is correct that prior discriminatory acts may be used as background evidence to
support a timely claim, even though the prior acts are not independently actionable because of
the statute of limitations.  *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002)
(the statute does not "bar an employee from using the prior [untimely] acts as background
evidence in support of a timely claim."); *Drewrey v. Clinton*, No. 08-1411, 2011 WL 229432, at

*5 (D.D.C. Jan. 26, 2011) ("[A]lthough 'prior acts' can be used as 'background evidence in support of a timely claim,' they are not independently actionable.") (quoting *Morgan*, 536 U.S. at 113); *Clark v. Marsh*, 665 F.2d 1168, 1174-76 (D.C. Cir. 1981) (finding historic discrimination against the employee as an aggravating factor for establishing constructive discharge). The plaintiff may thus rely on evidence of Desautels's May 2007 comments, the "Dream Team" presentation, and the September 2007 security investigation as background evidence in support of timely claims of discrimination.[5]

### c. The Plaintiff's Claim for Constructive Discharge

Timing issues aside, the defendants contend that the plaintiff "has not pled, nor does the record support, that her workplace had become so intolerable as of [November 19, 2007] as to warrant" a claim for constructive discharge based on her resignation on that date.[6] Defs.' Mem. at 21. Since the parties have submitted and the Court has considered evidence outside the pleadings regarding the viability of the plaintiff's constructive discharge claim, the Court must treat the defendants' motion on this issue as a motion for summary judgment, rather than as a motion to dismiss. *See Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003) (per curiam). The Court finds that, based on the allegations and record facts here, summary judgment on the plaintiff's claim for constructive discharge is not appropriate.

The defendants argue that the plaintiff cannot establish a constructive discharge for several reasons. First, the defendants contend that, even if they did plan to transfer the plaintiff

---

[5] The plaintiff has raised various additional arguments regarding timeliness, but the Court need not reach them given the Court's conclusions regarding timeliness described above.

[6] As noted above, the defendants do not, at this time, challenge any constructive discharge claim arising from events subsequent to November 19, 2007. The defendants do appear to suggest, however, that constructive discharge cannot provide an independent basis for Title VII liability in this case. *See* Defs.' Mem. at 12-13 (citing *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 73 (D.D.C. 2006)). The rationale for the conclusion that constructive discharge cannot independently give rise to Title VII liability in this case is unclear. Absent further clarification on this point at a later stage in this litigation, this Court, like other courts in this district, will treat constructive discharge as a potential basis for Title VII liability. *See, e.g.*, *Lewis v. District of* Columbia, 653 F. Supp. 2d 64, 81 (D.D.C. 2009) (stating elements for an "actionable constructive discharge claim" under Title VII).

to Iraq out of discriminatory intent, she has not sufficiently alleged aggravating factors showing that her working situation had become objectively intolerable, which is a requirement for establishing constructive discharge. Second, the defendants point out that the plaintiff submitted a resignation letter on November 19, 2007 that stated that she was resigning for personal reasons and did not reference any discrimination. Third, the defendants submit that the plaintiff's constructive discharge claim is precluded because she signed a DIA Civilian Mobility Agreement that acknowledged the possibility of her deployment and relocation.

An employee's decision to resign is ordinarily presumed to be voluntary. *Aliotta*, 614 F.3d at 566. "In certain cases, the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary." *Id.* "The test for constructive discharge is an objective one: whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances." *Id.* "Constructive discharge doctrines . . . extend liability to employers who indirectly effect a discharge that would have been forbidden by statute if done directly." *Simpson v. Fed. Mine Safety and Health Review Comm'n*, 842 F.2d 453, 461 (D.C. Cir. 1988).

"An actionable constructive discharge claim requires a showing that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that she had no option but to end her employment." *Lewis v. District of* Columbia, 653 F. Supp. 2d 64, 81 (D.D.C. 2009); *see also Kalinoski*, 435 F. Supp. at 78; *Clark*, 665 F.2d at 1173-74. The demonstration of "aggravating factors" requires a showing beyond the mere existence of a discrete discriminatory or retaliatory act. *Kalinoski,* 435 F. Supp. 2d at 79 (citing *Clark*, 665 F.2d at 1174).

The Court finds that the plaintiff has plausibly alleged sufficient aggravating factors to sustain a claim for constructive discharge on November 19, 2007.  First, this is not a case in which the plaintiff has claimed only a single instance of discrimination.  The plaintiff has alleged a series of discriminatory actions.  For example, in addition to alleging that the defendants overtly expressed discriminatory attitudes towards her, the plaintiff alleged that she was subject to a baseless and discriminatory security investigation for attending a picnic in September 2007.[7] That security investigation occurred during the same time period that the plaintiff alleges Keough repeatedly asked her to volunteer for deployment to Iraq, prior to her assignment for involuntary deployment.  Stewart Decl. ¶ 7.  *See Kalinoski*, 435 F. Supp. 2d at 78 ("[A] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be . . . intolerable.") (quotation omitted); *Clark*, 665 F.2d at 1174-1176 (finding history of alleged discrimination against employee as an aggravating factor establishing constructive discharge).  Second, the plaintiff alleges that Keough told her if she did not accept a transfer to Iraq, she had to resign or be immediately terminated.  *See* Pl.'s Mem. at 29; Stewart Decl. ¶ 17.  A discriminatory ultimatum requiring a civilian employee either to resign or be transferred into an active war zone could constitute a constructive discharge.  *See Linder v.*

---

[7] The December 2007 security investigation could not be an aggravating factor establishing the alleged November 2007 constructive discharge that occurred earlier in time.  The test for constructive discharge turns on "whether a reasonable person in the employee's position would have felt compelled to resign under the circumstances," *Aliotta*, 614 F.3d at 566, and events that did not take place until December could not logically have affected a prior decision to resign in November.  The circumstances of the December investigation, however, would be relevant to the credibility of plaintiff's claims regarding the September investigation and her general allegation that the defendants misused the Agency's security investigation system in a concerted effort to discriminate against her and remove her from her position.  Similarly, the plaintiff may not be able to rely directly on Keough's alleged conduct in fabricating the claim that the plaintiff attempted to commit suicide as an aggravating factor for her alleged November constructive discharge because it appears, at least at this stage in the litigation, that the plaintiff was largely unaware of this conduct prior to the December 2007 investigation.  *See* Defs.' Reply at 13-14; *see also* Compl. ¶ 34.  The Court finds that evidence of Keough's fabrication, however, would still be relevant for establishing that defendants were engaged in an effort to retaliate against the plaintiff using security investigations, starting with the September 2007 investigation.

*Potter*, No. CV-05-0062, 2009 WL 2595552, at *10 (E.D. Wash. Aug. 18, 2009) ("Actions that might give rise to a constructive discharge claim include requiring the employee to perform unusually dangerous duties, subjecting the employee to violent acts or harassment, or subjecting the employee to punishment."); *Frazier v. Merit Sys. Protection Bd.*, 672 F.2d 150, 159 n.29 (D.C. Cir. 1982) (acknowledging that a resignation caused by an "improper or arbitrary transfer that would be hazardous to employee's health and [a] hardship to his family" could support a constructive discharge claim); *Smith v. World Ins. Co.*, 38 F.3d 1456, 1461-62 (8th Cir. 1994) (upholding finding of constructive discharge where employer gave employee an offer of "early retirement" and "threatened to 'turn the screws' and 'build a record' against [him] if he did not resign."). The Court accordingly rejects the defendants' arguments that the plaintiff has not alleged facts that could sustain a constructive discharge claim.

Defendants' next argument is that the plaintiff's resignation letter contains admissions that bar her claim for constructive discharge. The Court finds that there are genuine disputes of material fact regarding the admissions contained in the letter. First, the plaintiff has stated that Keough dictated some of the language in the letter. Stewart Decl. ¶ 17. Second, the plaintiff has also attached an internal memorandum from her husband's supervisor that further suggests that her resignation was involuntary. This memorandum states that a Japanese official was "erroneously informed that Ms. [Stewart] was deployed to Iraq when she had been in reality fired by DIA." Ex. 3 to the Declaration of Deven Hahn, dated March 12, 2010. These factual assertions and others suggest that discovery is warranted into the circumstances surrounding the plaintiff's resignation before reliable factual conclusions can be drawn from the substance of her resignation letter. *See McWay*, 269 F.R.D. at 39 (denying summary judgment prior to discovery).

Similarly, the Court finds that the Civilian Mobility Agreement that the plaintiff signed does not, at this juncture, bar her constructive discharge claim. This agreement indicates the plaintiff's understanding that, as a condition of her employment, she may be required to relocate to different duty assignments within the Agency. *See* Defs.' Reply at 10-11; Ex. 1 to the Declaration of Cheryl P. Boudreau, dated April 20, 2010. The defendants argue that "[h]aving accepted her position under these conditions, [the plaintiff] cannot be heard to contend that the occurrence of the condition [in the form of an assignment to deploy to Iraq]. . . rendered her job so intolerable as to force her to resign." Defs.' Reply at 10. The plaintiff responds, *inter alia*, that the mobility agreement, by its terms, does not permit arbitrary or discriminatory transfers; that the agreement prohibits "disciplinary" transfers, which would include retaliatory transfers; and that the agreement only pertained to the plaintiff's employment as a debriefer, while her proposed transfer to Iraq would have required her to work as an interrogator, which she contends is a materially different position. *See* Pl.'s Sur-Reply in Opp'n to Defs.' Mot. to Dismiss in Part or for Summ. J. in Part ("Pl.'s Sur-Reply") at 3-9. The plaintiff also seeks discovery of policies and records related to the agreement and the Agency's decision to deploy her to Iraq, including records of the mobility board, an Agency group tasked under the mobility agreement with making personnel assignment decisions according to a specified process. *Id.* at 9-10; Rule 56(f) Declaration of Deven Hahn, Esq. in Support of Plaintiff's Sur-Reply, dated May 14, 2010. The Court finds that a fuller development of the record relating to the mobility agreement, the policies it incorporates by reference, and its application to the plaintiff is necessary before a decision is rendered on the plaintiff's claims.

### d. The Plaintiff Is Entitled To Discovery

The plaintiff has requested discovery pursuant to former Rule 56(f) – recently amended as Rule 56(d) – of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56(d); Advisory Committee's Note, 2010 Amendments ("Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).").  Under Rule 56(d), a court may deny a motion for summary judgment, order discovery, or "issue any other appropriate order" if the non-moving party shows that it cannot present the facts needed to oppose the motion.  Fed. R. Civ. P. 56(d).  A non-moving party invoking Rule 56(d) "must state by affidavit the reasons why he is unable to present the necessary opposing material."  *McWay*, 269 F.R.D. at 38 (quoting *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*, 699 F.2d 1274, 1278 n.6 (D.C. Cir. 1983)).

The plaintiff has submitted affidavits identifying several areas of discovery that would be relevant to establishing her constructive discharge claim.  The plaintiff seeks discovery related to, among other things, the memorandum in which Col. Stewart's supervisor noted that the plaintiff was "in reality fired by the DIA"; policies and records related to the Civilian Mobility Agreement and the decision of the mobility board to assign the plaintiff to Iraq; and depositions of Keough and Desautels.  *See* Rule 56(f) Declaration of Deven Hahn, Esq., dated March 12, 2010; Rule 56(f) Declaration of Deven Hahn, Esq. in Support of Plaintiff's Sur-Reply, dated May 14, 2010.

The Court agrees that the plaintiff is entitled to conduct discovery before being required to oppose the defendant's motion for summary judgment.[8]  *See McWay*, 269 F.R.D. at 39;

---

[8] The Court does not find that the plaintiff is necessarily entitled to all the discovery sought in her affidavits, but simply that the plaintiff may seek relevant discovery to which she is entitled pursuant to the Federal Rules of Civil Procedure before being required to respond to the defendant's motion for summary judgment.  *See McWay*, 269 F.R.D. at 39 n.2.

*Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C. Cir. 1995) (noting that another circuit has held that "Rule 56(f) motions should be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence'") (quoting *Wichita Falls Office Assocs. v. Banc One Corp.*, 978 F.2d 915, 919 n.4 (5th Cir. 1992)). "[S]ummary judgment is ordinarily appropriate only after the plaintiff has been given an adequate opportunity to conduct discovery." *McWay*, 269 F.R.D. at 39 (citing *Americable Int'l, Inc. v. Dep't of Navy,* 129 F.3d 1271, 1274 (D.C. Cir. 1997)). "This is so even if a plaintiff has had an opportunity to collect evidence through the EEO administrative process." *Id.* (quoting *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 30 (D.D.C. 2007)). Accordingly, the Court denies without prejudice the defendants' motion for summary judgment on the plaintiff's constructive discharge claim.

## B. Plaintiff's Motion to Amend the Complaint

As described above, the plaintiff has moved to amend her complaint "to clarify the nature of her claims related to constructive discharge and the timeline of events surrounding her deployment to Iraq," to drop her Section 1981 claim against the individual defendants, and to add a claim against the individual defendants under the *Bivens* doctrine. Pl.'s Mem. at 39.

Leave to amend a complaint should be freely granted when justice so requires. *See* Fed. R. Civ. P. 15(a)(2). The Court, however, may deny a motion to amend if the amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). "An amended complaint is futile if it . . . could not withstand a motion to dismiss." *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002) (citation omitted).

Amendment of the complaint to add the *Bivens* claim against the individual defendants would be futile and leave to amend is therefore denied with respect to that claim. For the reasons

explained above, the plaintiff cannot extend liability to the individual defendants for federal employment discrimination. Further, the proposed Amended Complaint "alleges a claim under the Rule of *Bivens*" only "[t]o the extent that Ms. Stewart does not have a Title VII claim for any of the conduct set forth herein . . ." Am. Compl. ¶ 87. As discussed above, Title VII does apply to the conduct whose coverage was in doubt – i.e., post-employment retaliation and retaliation directed against the plaintiff's husband. Therefore, by its own terms, the plaintiff's proposed amendment on this issue is unnecessary.

The plaintiff shall be permitted, however, to amend the complaint "to clarify the nature of her claims related to constructive discharge and the timeline of events surrounding her deployment to Iraq," and to remove her claim against the individual defendants for violating Section 1981, since that claim would be subject to dismissal anyway as explained above.

## III.    CONCLUSION

For the reasons stated above, the defendants' motion to dismiss the individual defendants from this action is granted; the defendant's motion for summary judgment on the plaintiff's constructive discharge claim is denied without prejudice; and the defendants' motion is denied in all other respects. The plaintiffs' motion to amend the complaint is granted in part and denied in part and the plaintiff's motion for discovery is granted. Within twenty (20) days of this Memorandum Opinion and the accompanying Order, the parties are directed to meet and confer and to file a joint report with the Court that complies with Local Civil Rule 16.3 and Paragraph 5 of the Court's Standing Order. The Court will then schedule a status conference if necessary.


DATED: May 16, 2011                                    /s/ *Beryl A. Howell*
                                                                          BERYL A. HOWELL
                                                                          United States District Judge